## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

ANNA WISE, on behalf of
herself and the Proposed Rule 23 Class,

      Plaintiff,

v.

AMENTUM SERVICES INC.;
GANA-A'YOO SERVICES CORPORATION;
SIX MILE LLC;
GRAY HAWK GLOBAL CORPORATION; and
LEIDOS, INC.

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Anna Wise, on behalf of herself and the Proposed Rule 23 Class, by and through her attorneys, alleges as follows:

### INTRODUCTION

1.     This case is about corporate collusion to deprive workers of bargaining power, suppress wages, prevent workers from advocating for better working conditions, and silence dissent.

2.     The Defendants in this case are separate employers who should be competing for employees through decent wages and working conditions but, instead, illegally agree not to poach each other's employees and to blacklist employees who raise safety, discrimination, pay equity, or other workplace issues.

1

3.      This illegal conduct is systemic, impacting the entire market in which Defendants would otherwise compete: the United States Antarctic Program ("USAP").

4.      Given the isolated and dangerous conditions of jobs in the USAP, along with the rigorous qualification requirements, these workers are vulnerable and have few other employment options. They are entirely at the whim of Defendants' anticompetitive conduct.

5.       The National Science Foundation ("NSF") is the federal agency responsible for managing the USAP. According to the NSF, the USAP deploys about 700 people to the remote region of Antarctica each year to perform scientific research. In addition to scientific researchers, over 1,500 workers are deployed per year to provide supporting logistical and operational services.

6.      The NSF contracts with Leidos, Inc., to manage all support-related workers through the Antarctic Support Contract ("ASC").

7.      Leidos, as the prime contractor, hires its own support workers and also subcontracts with the following companies for the provision of support staff: Amentum Services Inc., Gana-A'Yoo Services Corporation ("GSC"), Six Mile LLC, and Gray Hawk Global Corporation ("GHG") (collectively, "Defendants" or the "ASC Contractors").

8.      Workers hired by the ASC Contractors ("ASC Employees") are primarily responsible for support operations in Antarctica, including providing station and field operations, logistics, information technology, construction, maintenance, food preparation, waste removal, and more.

9.      ASC Employees typically work on a per-season basis, with a majority working during the five-month austral summer season, which is relatively warmer and lasts from approximately early-October to late-February, and the remainder working during the shoulder and

2

winter seasons, lasting from approximately late-February to early-October.

10.     Although ASC Employees work across different fields, the requirements for working in Antarctica (colloquially, "on ice") are so unique that jobs that would generally have different hiring requirements outside of Antarctica—like, for example, food preparation and information technology—compete for the same pool of workers. Further, because of the unique work environment, many ASC Employees learn the relevant job duties once they are "on ice." Given the expectation that workers have transferable skills and learn on the job, it is common for repeat seasonal workers—those who work multiple seasons—to apply for and work in different fields for different ASC contractors.

11.     One of the primary obstacles to working in Antarctica is that an ASC Worker must be deemed physically qualified through the Arctic and USAP Polar Physical Qualification ("PQ") process, a time-consuming, expensive, and lengthy bureaucratic process.

12.     ASC Employees cannot start the PQ process until they have accepted a job offer from one of the ASC Contractors and cannot travel to or perform work in Antarctica unless they have passed the PQ process, *i.e.*, until they are "PQ'd."

13.     ASC Contractors extend two types of job offers. The first, a "primary" job offer, is a standard offer of employment, contingent on meeting certain screening requirements, including being PQ'd and passing a background check. The second, an "alternate" job offer, is akin to being waitlisted for a primary job offer. Alternate job offers provide no guarantee of employment, but accepting an alternate job offer allows a worker to begin the PQ and background check processes.

14.     The PQ status is so coveted and difficult to obtain that a worker should have considerable bargaining power once they have been PQ'd.

15.    However, the ASC Contractors have agreed among themselves not to offer jobs to PQ'd workers who have already accepted primary job offers from another ASC Contractor, and not to offer jobs to PQ'd workers who have already accepted an alternate job offer without permission from the ASC contractor who extended the alternate job offer.

16.    Specifically, Defendants have agreed that they will abide by an internal database that designates a worker as hired and therefore off limits, will seek each other's permission before extending a primary offer to a worker who has been hired by another Defendant as an alternate, and will consider any worker officially or unofficially deemed by any Defendant "ineligible for rehire" as blacklisted and not hirable.

17.    Due to the ASC Contractors' anticompetitive practices, workers cannot leverage their PQ'd status to seek higher pay or better working conditions.

18.    Once hired into a job position and relocated to Antarctica, all ASC Employees are expected to remain in Antarctica for the duration of the working season.

19.    Still, some workers leave the ice in the middle of a season for various reasons, such as sustaining an injury or illness.

20.    Because it is extremely difficult to get on or off the ice, the ASC Employees who are already present on ice during a given season are largely a closed market for any job that may become available on ice during the course of the season. However, ASC Contractors' no-poach agreement extends through the term of employment: ASC Contractors will not hire each other's employees on ice without the express permission of the other ASC Contractor.

21.    This conduct constitutes a per se violation of the Sherman Act. It is a naked, horizontal restraint of trade. This conduct also violates Colorado's prohibition on covenants not to

compete because it restricts the right of workers to receive compensation for performance of labor for any employer.

22.    Accordingly, on behalf of herself and a proposed Rule 23 class of similarly situated workers, Plaintiff seeks a declaration that ASC Contractors' conduct violates the Sherman Act and Colorado law, actual and statutory damages flowing from ASC Contractors' conduct, attorneys' fees and costs, pre- and post-judgment interest, and all other relief legally or equitably permissible and that the Court deems just and proper, as detailed in the Prayer for Relief.

23.    Plaintiff also asserts on behalf of herself and a proposed Rule 23 class of similarly situated workers a claim under Colorado's Public Health Emergency Whistleblower Act (the "PHEW Act") against Defendant Six Mile because Six Mile maintains a policy of prohibiting its workers from speaking out publicly or otherwise about workers' reasonable concerns about significant workplace threats to the health and safety of workers and others. Consistent with Colorado law, Plaintiff seeks actual and statutory damages, attorneys' fees and costs, pre- and post-judgment interest, and all other relief legally or equitably permissible and that the Court deems just and proper, as detailed in the Prayer for Relief.

24.    Plaintiff also brings individual claims on behalf of herself against Defendants Six Mile and Amentum for engaging in unlawful conduct with respect to her employment, including by retaliating against her for discussing wages and pay equity in the workplace by ensuring she would be blacklisted from the USAP, thus preventing her from pursuing her chosen career path in a remote and otherwise inaccessible workplace: Antarctica. Ms. Wise seeks actual and statutory damages flowing from this conduct, attorneys' fees and costs, pre- and post-judgment interest, and all other relief legally or equitably permissible and that the Court deems just and proper, as detailed

in the Prayer for Relief.

## THE PARTIES

25.     Leidos, Inc. is incorporated in Delaware with a principal place of business in Reston, Virginia. Leidos has been the prime contractor for the USAP since 2017. At all pertinent times, Leidos has been registered to do business in the State of Colorado and has done business in the state, with its registered agent located in Centennial, Colorado. As the prime contractor for the USAP, Leidos handles the bulk of logistics for the USAP.

26.     Amentum Services, Inc., is a private government services company headquartered in Chantilly, Virginia. At all pertinent times, Amentum has been registered to do business in the State of Colorado and has done business in the state, with its registered agent located in Centennial, Colorado. Amentum was founded in February 2020 and subsequently acquired PAE Incorporated, then an ASC subcontractor, in February 2022. Amentum subcontracts with Leidos to provide seasonal employees to work in Antarctica in the following fields: carpenters, heavy equipment operators, mechanics, electricians, pipefitters, welders, firefighters, and more.

27.     Gana-A'Yoo Services Corporation ("GSC") provides services for both private and government clients. At all pertinent times, GSC has been registered to do business in the State of Colorado and has done business in the state, with its registered agent located in Centennial, Colorado. GSC subcontracts with Leidos to provide seasonal employees to work in Antarctica in the following fields: food services, facilities and maintenance support, logistical support, and more.

28.     Six Mile, LLC ("Six Mile") provides services for both private and government clients. At all pertinent times, Six Mile has been registered to do business in the State of Colorado

and has done business in the state, with its registered agent located in Centennial, Colorado. Six Mile subcontracts with Leidos to provide seasonal employees to work in Antarctica in the following fields: waste management, equipment operation, and spill response.

29.    Gray Hawk Global Corporation ("GHG") is a private company headquartered in Webster, Texas. It provides engineering and IT support to a broad range of government and commercial customers. GHG subcontracts with Leidos to provide seasonal employees to work in Antarctica in the following fields: information technology and infrastructure, information systems, and telecommunications. As a member of the ASC, which has its operations headquartered in Centennial, Colorado, GHG has sufficient ties to Colorado to subject it to the jurisdiction of this Court.  Indeed, all GHG job offers for work in Antarctica are contingent upon the prospective employee's successful completion of the PQ process, with the only GHG pre-approved doctor located in Colorado and the only in-person drop-off location for PQ paperwork located in Colorado.  Further, GHG's contracts for employment in Antarctica include Colorado choice of law provisions, and GHG's Human Resources ("HR") Department for its ASC Employees is based out of Colorado, as evidenced by the Colorado area code of its HR phone number: 720.

30.    Plaintiff Anna Wise is domiciled in Colorado. She began working in Antarctica in 2015 as a steward for Defendant GSC.  In 2018, Ms. Wise accepted an offer as a Solid Waste Technician and began working for Defendant Six Mile. Ms. Wise continued to work for Six Mile in the Waste Department through the 2022-2023 austral summer season. Plaintiff Wise further applied for and was denied employment by Defendant Amentum for the 2023-2024 season in Antarctica. Ms. Wise has been injured by reason of the violations alleged herein.

**JURISDICTION & VENUE**

31.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331

because this action is brought under the Sherman Act, and supplemental jurisdiction over the state

law claims under 28 U.S.C. §1367. Plaintiff's state law claims are so closely related to her federal

law claims that they form part of the same case or controversy under Article III of the United States

Constitution.

32.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of

the acts or omissions giving rise to this claim arose from transactions conducted in this District or,

in the alternative, venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because there is no District

in which this action may otherwise be brought under 28 U.S.C. § 1391(b) and at least one

Defendant is subject to the Court's personal jurisdiction with respect to this action.

33.     This Court has personal jurisdiction over the parties. Defendants are domiciled,

transact business, maintain substantial contacts, and/or committed acts in furtherance of the illegal

scheme and conspiracy throughout the United States, including in Colorado ASC operations are

headquartered in Centennial, Colorado, hiring for ASC contracts is based out of Colorado, and the

only US-based doctor pre-approved and contracted to engage in the PQ process required for

deployment to Antarctica is based in Colorado, just minutes from the ASC operation headquarters.

Many workers are also required to undergo orientation in Centennial, Colorado prior to

deployment in Antarctica.

34.     Defendants intended and contractually required that ASC Employees' employment

terms would be "governed and interpreted under the Laws of the State of Colorado."

35.     Upon information and belief, and at all pertinent times, most income earned by

contractors within the ASC has been reported through Colorado's Unemployment Insurance Division.

36.     Defendants' acts have caused injury to persons residing in and doing business throughout the United States, including in Colorado, which has the highest number of participants in the USAP program as compared to any other state.

37.     Plaintiff Anna Wise is domiciled in Colorado and applied for job positions with Defendants-while domiciled in Colorado.

38.     Jurisdiction supporting claims for attorneys' fees and costs is conferred by, at a minimum, 15 U.S.C. § 4304, C.R.S. § 24-34-405, C.R.S. § 8-14.4-107, C.R.S. § 8-5-104, and C.R.S. § 8-2-113.

39.     Plaintiff has exhausted all available administrative remedies with respect to her employment claims brought herein, receiving Notices of Right to Sue from the Colorado Civil Rights Division ("CCRD") on October 17, 2024, a Notice of Right to Sue from the Equal Employment Opportunity Commission ("EEOC") on October 21, 2024, and a Notice of Right to Sue from the Colorado Department of Labor and Employment ("CDLE") on December 17, 2024.

## STATEMENT OF FACTS

**A.     The market for ASC Employees**

40.     Individuals seeking to work in a support position in Antarctica can apply for a position with any of the ASC Contractors.

41.     A job applicant can find and apply for ASC positions on each individual ASC Contractor's website.

42.     Individuals interested in working in Antarctica regularly apply for positions with

more than one ASC contractor, including for positions above or below their skill level or outside their normal area of employment, in an effort to secure any position.

43.    The largest number of workers are employed by ASC Contractors during the austral summer season. Thus, while hiring takes place year-round, a significant number of jobs are posted by ASC Contractors near the end of each austral summer season, or in approximately January each year.

44.    ASC Contractors review applications on a rolling basis, and they continue hiring year-round, at times posting evergreen job posts to ensure they have a steady stream of applicants. Because the PQ process can be so difficult, it is not unusual for ASC Contractors to actively hire for the austral summer season between January and July each year, with those hired in July having a more difficult time clearing the employment pre-requisites, including the PQ process, in time to deploy for the start of the austral summer season in October.

45.    Each of the ASC Contractors has its own internal recruiters who vet job applicants to ensure they meet the job requirements. The recruiters work and reside within the United States, mainly in Colorado.

46.    The recruiters forward qualified candidates to their respective ASC Contractor's hiring manager, who conducts further interviews. The hiring managers work in Antarctica and know the specific experience needed for unfilled job positions.

47.    The ASC Contractors can make either a primary offer or an alternate offer to a job applicant.

48.    An offer to be a "primary" for an upcoming season is a standard offer of at-will employment but also requires the successful completion of the pre-requisites described herein.

49.    An offer to be an "alternate" is, in theory, similar to being waitlisted for a potential, non-guaranteed future job opening. An alternate has no guaranteed employment with the ASC Contractor and there is no monetary compensation associated with an alternate offer.

50.    Upon signing either a primary or alternate contract, the worker receives a PQ packet. This can take between one week and one month. From there, the worker is expected to schedule all appointments necessary to have the packet completed. The only doctors with whom the ASC Contractors have a contract are located in New Zealand and in Colorado. These are the only doctors who can direct bill for their services to Defendants.

51.    In addition to undergoing an extensive medical examination, workers are required to undergo a dental exam, blood tests, and a drug test. The worker is expected to schedule all of these appointments with various providers.

52.    Once each of these steps is completed, the worker must send their materials to the University of Texas Medical Branch ("UTMB"), another USAP contractor that processes the paperwork. UTMB only accepts the materials by regular mail or fax, and it regularly loses these materials, forcing workers to resubmit their PQ packets.

53.    In the alternative, a worker is permitted to drop off their PQ packet materials at the ASC headquarters in Centennial, Colorado. Employees of *any* ASC Contractor are allowed to drop their materials off at this Colorado office, and the office will transmit the materials to UTMB for the worker.

54.    Once UTMB confirms receipt of the packet, it can take up to six weeks for a worker to hear whether they have been PQ'd. For many workers, UTMB responds that corrections are needed for the worker to be PQ'd, from things as minor as obtaining a required vaccine or as

serious as undergoing treatment to address a more serious condition. The cost to address these medical requirements fall solely on the worker, and the time to address these matters further delays the PQ process.

55.    In the alternative, UTMB may respond that a worker is NPQ'd (not physically qualified), which can occur for a variety of reasons as the physical qualification standard to deploy to Antarctica as an ASC Worker is a demanding one.

56.    The PQ process is notoriously difficult to navigate, from the scheduling of appointments to ensuring information shared with a medical provider is not misunderstood as a basis for disqualification to addressing any needed corrections or a situation where the worker is initially NPQ'd.

57.    The PQ process must also be successfully completed *before* a worker is permitted to start the extended background investigation (EBI) process, a recent change to the program implemented in or around 2022. The EBI process takes a significant amount of time, such that workers need to be PQ'd as soon as possible to ensure they can also pass the EBI process and deploy to Antarctica.

58.    Because the PQ process is so difficult, employers are known to not count or tally an ASC Worker until that person is PQ'd. A worker can likewise not be booked on a flight to New Zealand or Chile and, from there, Antarctica until they have been PQ'd.

59.    Because workers cannot start the lengthy PQ process until they have accepted a job offer and cannot begin work in Antarctica until they pass the PQ process, applicants regularly accept alternate offers to be eligible to complete the PQ process while hoping to be offered a primary position.

60.    But ASC Contractors have no obligation to provide alternates with primary job offers.

61.    For these reasons and those discussed below, an "alternate" job offer is illusory.

**B.    ASC Contractors avoid pre-season competition for employees by entering into no-poach agreements**

62.    If they were competing fairly, the ASC Contractors would openly compete to hire and retain qualified seasonal support employees before the work season in Antarctica, particularly those who have already successfully completed the PQ process, by offering competitive wages, benefits, and working conditions.

63.    Indeed, competition should be fierce. Leidos, the prime contractor, has admitted that "[c]ompetition for skilled personnel is intense, and the costs associated with attracting and retaining them are high and made even more competitive as a result of the external environment, including increasing rates of job transition and low unemployment." But contractors have agreed not to compete over workers, especially once they have been PQ'd, when competition should be most fierce.

64.    In a normal competitive market, an applicant offered multiple primary contracts with different ASC Contractors would be able to leverage the offers against one another for better pay or working conditions. And the mere threat that workers would be able to seek multiple job offers would place upward pressure on wages and working conditions provided by ASC Contractors.

65.    Workers' pre-season bargaining power would increase even further once the applicants pass the PQ process, as it would guarantee they would be eligible to work in Antarctica (pending their background check).

13

66.     In a competitive market, even an individual with an alternate offer or multiple alternate offers from different ASC Contractors could continue to seek primary offers. The alternate's bargaining power, particularly their ability to obtain primary offers, would increase substantially after successfully completing the PQ process.

67.     In a competitive market, ASC Contractors who wished to recruit or retain skilled and qualified workers would have to offer them competitive compensation or other benefits to do so.

68.     But the ASC Contractors have agreed not to compete.

69.     Specifically, to avoid the pre-season competition, the ASC Contractors have agreed not to poach each other's workers.

70.     This happens in two ways: (1) by agreeing to ask and obtain permission from each other before making any job offer to a worker who already has an "alternate" contract from another ASC Contractor; and (2) by refusing to interview or otherwise make an offer to any worker who already has a "primary" contract from another ASC Contractor. Both are explained below.

71.     The ASC Contractors use a database, frequently referred to as "the pipeline," to perpetuate their no poach agreement. The database, which is accessible by all ASC Contractors, shows when an ASC applicant has signed a contract – whether primary or alternate – with any ASC Contractor. The database also shows when such a worker is PQ'd and booked on a flight.

72.     Under the ASC Contractors' agreement, if one ASC Contractor makes a primary offer to an applicant for employment for a season in Antarctica and the applicant accepts, then no other ASC Contractor can make a primary or alternate offer to that applicant for the same season.

73.     Likewise, under the ASC Contractors' agreement, if one ASC Contractor makes an

alternate offer to an applicant and the applicant accepts it, then no other Contractor can make an alternate or primary offer to that applicant unless and until the ASC Contractor that made the initial alternate offer agrees to drop the alternate contract, i.e., "release" the worker.

74.    The ASC Contractor holding the alternate contract has unfettered discretion to decide whether to drop the alternate contract and release the worker upon request. But the agreement to ask permission in and of itself is illegal.

75.    The ASC Contractors entered into and maintain the no-poach agreement in the United States, where they recruit and hire employees and where they contract with Leidos.

76.    Additionally, the no-poach agreement has a direct, substantial, and reasonably foreseeable effect on United States commerce because these the ASC Contractors are all based in the United States, hire their employees in the United States, and contract with Leidos in the United States.

77.    The ASC Contractors' no-poach agreement injures both alternate and primary workers, with both losing their ability to leverage ASC Contractors against one another for better wages, benefits, and/or working conditions.

**C.    ASC Contractors Avoid In-Season Competition for Workers by Entering into No-Poach Agreements**

78.    In a properly functioning labor market, the competition for replacement employees amongst ASC Contractors during a season on ice would be equally, if not more, competitive than the pre-season competition.

79.    It is common for ASC job positions to become available in the midst of a work season in Antarctica for multiple reasons, including resignations, terminations, incompatibility with working conditions, and physical illness or injury.

80.    During the season, ASC Employees who already successfully completed the PQ process, traveled to Antarctica, and developed both specialized skillsets and working relationships on ice would have immense bargaining power to negotiate for higher paying positions with other ASC Contractors in need of qualified replacement workers. This is particularly true given that transportation to and from Antarctica is limited, the operating season is short, and many ASC positions can be learned on the job.

81.    In fact, ASC Contractors regularly encourage their workers to "volunteer" to work in other departments and for other contractors to learn different positions on ice. This allows for cross-training as well as unpaid labor, to the benefit of the USAP and the ASC Contractors.

82.    ASC Employees are not paid to "volunteer" even though they are performing work, however they seek out these opportunities so that they can apply to other positions on ice in future seasons, using their "volunteer" work to boost their resume. This "volunteer" work can often help a worker show they have sufficient experience to be hired into a more skilled job in a future season, even if their experience is limited. It also allows the worker to meet different hiring managers.

83.    Most long-term workers in Antarctica began their careers in low-skilled positions, such as janitors, cooks, galley workers, and stewards. They were able to use their time on ice and "volunteer" work for other departments to increase their skillset and be hired into more skilled jobs over time, including to the point of becoming hiring managers or operational support staff (i.e., full-time employees, as opposed to seasonal workers).

84.    Given this cross-training, in a properly functioning market, ASC Contractors who wished to retain their employees during the season on ice would need to offer competitive wages and desirable working conditions to do so.

85.     Instead, to avoid this competition, the ASC Contractors agree not to poach each other's employees for the entire duration of the working season in Antarctica.

86.     Pursuant to this no poach agreement, an employee working in Antarctica for one ASC Contractor will not be considered for a position with a different ASC Contractor during the season. The only exception to this in-season no poach agreement is if both ASC Contractors coordinate and agree to permit such a transfer or if the position is critical.

**D.     ASC Contractors Conspire to Blacklist Workers**

87.     In addition to their no poach agreements, ASC Contractors also agree to blacklist certain workers from being employed to work for any ASC contractor.

88.     ASC Contractors can mark a worker "ineligible for rehire" in their internal databases for a variety of reasons, including their being "disruptive" and failing to correct such behaviors after being placed on notice of such.

89.     These disruptive behaviors can include engaging in protected conduct under state and federal law.

90.     ASC Contractors do not provide workers with transparency into the process of listing an employee as ineligible for rehire, nor are ASC Employees given any rights regarding such designation, including notice, a chance to be heard, or a right to appeal.

91.     Meanwhile, the ASC Contractors voluntarily agree to perform reference checks prior to hiring candidates for a position and not to consider for hire any worker who has been deemed ineligible for rehire by any of the ASC Contractors for any reason.

92.     When the ASC Contractors perform these reference checks, they do so without making any inquiry into the reasons a worker may have been marked ineligible for rehire, including

whether they were deemed ineligible for rehire for having engaged in conduct protected by federal and state law.

93.     By agreeing to perform this reference check and to rely exclusively on another ASC Contractor's designation of an employee as ineligible for rehire, the ASC Contractors engage in a process of blacklisting ASC Employees deemed "disruptive," including those who have engaged in conduct protected by federal and state law.

94.     ASC Contractors have enforced this agreement, among other things, by threatening the jobs of hiring managers who seek to hire a blacklisted ASC Employee.

95.     The threat and known practice of blacklisting harms ASC Employees, among other reasons, because it discourages them from making complaints about pay, working conditions, discrimination, and other employment matters.

ASC Contractors systematically stifle dissent and respond harshly to complaints and concerns raised by ASC Employees regarding unsafe working conditions, discrimination, and depressed wages. Retaliation against workers who raise these issues by all ASC Contractors is a well-known practice and allows ASC Contractors to leave these concerns unaddressed as workers are scared to raise them.

96.     In some instances, ASC Contractors take additional steps to cover up this unlawful conduct by agreeing to not hire ASC Employees who they consider "not recommended for rehire" even though they are "technically" listed as eligible for rehire.

E.     **ASC Contractors Provide Poor Working Conditions**

97.     ASC Employees are forced to work in unsafe conditions for minimal pay because they are unable to advocate for better conditions without facing significant risk of retaliation.

98.     The standard minimum work schedule for ASC Employees in Antarctica is Monday through Saturday, nine (9) hours per day, for a minimum of fifty-four (54) hours per week.

99.     ASC Employees are not paid any form of overtime pay for working more than 40 hours per week or 12 hours in a single day. ASC Contractors also regularly require their workers to work over the contracted amount of 54 hours per week without paying them any type of extra compensation for the additional hours, as ASC Contractors pay a flat rate per week for work performed.

100.     ASC Employees are paid low wages for the skill level, risks associated with work in Antarctica, and the fact that they are required to work away from their families and homes. For example, a current GSC job posting for the Lead Janitor at McMurdo Station offers $648 to $736 weekly in pay. That's between $12-$13/hour for a supervisory position on ice assuming the worker does not exceed the 54-hour-per-week base schedule, which they regularly do.

101.     ASC Employees also receive no paid time off, such as vacation, and no defined sick leave while working in Antarctica.

102.     In addition to being required to work long work hours and long weeks, ASC Employees face extreme and hazardous conditions while living and working in Antarctica, both on established stations (such as McMurdo Station) and on remote and isolated field stations in Antarctica, with very limited medical services available.

103.     Lack of infrastructure and unsafe work equipment at various parts of the Antarctic stations, such as non-functioning toilets, lack of running water, and lack of heat in below-freezing temperatures, also present health and safety risks to ASC Employees.

104.     Women and other marginalized groups working on ice are also at a heightened risk

19

of sexual harassment and the crimes of sexual assault and stalking, as federal lawmakers and officials have recently taken note of.

105.    During the summer of 2022, after conducting a significant investigation examining the extent of sexual harassment and sexual assault in the USAP, the NSF publicly released the Sexual Assault/Harassment Prevention and Response Report ("SAHPR Report"). In compiling the "Needs Assessment," the NSF held extensive interviews with Leidos and received information from USAP workers though focus groups and hundreds of survey responses, *inter alia.*

106.    The SAHPR Report is full of the accounts of USAP workers who described the dangerous working environment. For example, the Report states, "The majority of the focus group participants who presented as women described experiencing discriminatory, sexually harassing, stalking, and sexually abusive and violent incidents at their workplace, in their rooms, and in public spaces." The Report states that 59% of women said they had experienced harassment or assault while on the ice, and 72% of women said such behavior was a problem in Antarctica.

107.    The SAHPR Report also details the investigation's finding of systematic retaliation against workers when they reported sexual assault, harassment, and stalking. The Report states, "**A significant number of community members** believe that contractor and subcontractor human resources departments retaliate against victims and those who support them," and it details accounts of retaliation like: those reporting not being rehired or being sent off ice; individuals being placed on a "blacklist;'" workers receiving poor performance reviews; workers being told they would not be rehired.

108.    On October 10, 2024, and after years of an ongoing Congressional investigation, federal House Science, Space, and Technology Committee leaders sent a public letter to the NSF

expressing their alarm about the safety issues on ice and rampant retaliation for those who raise concerns about these problems. The accompanying press release from the House members highlights "Leidos's mismanagement as the prime contractor operating the USAP," and emphasizes their findings of systemic sexual harassment, assault, and retaliation for those who speak out.

109.    There is no police presence at McMurdo Station and all law enforcement falls to one sworn on-site deputy U.S. marshal.

**F.    Plaintiff Wise's Experience Working on Ice**

110.    Ms. Wise worked in Antarctica for an ASC Contractor over various seasons from 2015 to 2023.

111.    Ms. Wise began working for Defendant GSC in 2015 as a steward.

112.    In this role, Ms. Wise provided cleaning, stocking, and other support services at McMurdo and the South Pole Stations.

113.    In 2018, Ms. Wise began working for Defendant Six Mile as a Solid Waste Technician at McMurdo Station.

114.    Pursuant to the Antarctic Treaty, no waste can be left in Antarctica, meaning that trash, biohazardous waste, and any other types of waste must be completely removed from the continent every season.

115.    Working with waste is inherently hazardous.

116.    As a Solid Waste Technician, Ms. Wise processed large loads of waste and worked with large sea containers.

117.    Throughout her time in the Waste Department, Ms. Wise learned how to operate

various machinery in her department and others.

118.    Ms. Wise received strong performance reviews and Defendant Six Mile hired Ms. Wise back for every season between the 2018-2019 and the 2022-2023 austral summer seasons.

119.    In or around March 2022, Six Mile promoted Ms. Wise from Solid Waste Technician to Solid Waste Technician Lead. The pay differential between her previous role as a technician and her new role as a lead (supervisor) was a mere $23 per week, or 42.5 cents per hour more based on a 54-hour workweek.

120.    As a lead, Ms. Wise took on the following additional responsibilities: reviewing and overseeing payment of invoices for the NSF waste loads; managing equipment operators and sea containers; training staff on the proper operation of equipment; managing and tracking day-to-day waste operations; and assisting with a significant demolition project. This list is non-exhaustive.

121.    Ms. Wise excelled in this position, and in early 2023, Six Mile promoted Ms. Wise to the role of Solid Waste Supervisor for the remainder of the austral summer season.

122.    Ms. Wise took on even more responsibility in this role, including increased data entry and reporting, managing schedules and time cards, and overseeing the waste apparatus for the NSF, including the "vessel revolution" that takes place once per year when the base's waste is loaded onto a ship and brought back to the United States through Port Hueneme, CA, where Ms. Wise would manage its unloading and disposal.

**G. Plaintiff Wise Raises Concerns of Pay Inequity and Disparity, as Well as Safety**

123.    Ms. Wise's last season on ice was the 2022-2023 austral summer season.

124.    During that season, James VanMatre served as the Program Manager overseeing

Six Mile's operations on ice.

125.    Mr. VanMatre's responsibilities included overseeing personnel and compensation decisions, managing Six Mile's operations on the ground in Antarctica, and providing references to other contractors regarding employee recommendations and rehiring status, either directly or through Six Mile's HR Department.

126.    During the 2022-2023 austral summer season, Clair Von Handorf acted as the Hazardous Waste Manager for Six Mile's Antarctic operation.

127.    Ms. Von Handorf's responsibilities included overseeing the responsibilities of the staff in the Hazardous Waste Department and ensuring compliance with the various applicable standards for the Department's work.

128.    In July 2022, and prior to deploying to Antarctica, Ms. Wise and other employees met with Mr. VanMatre in Denver, Colorado to discuss non-monetary compensation. Ms. Wise and her colleagues provided Mr. VanMatre a handout showing the minimum wage in Denver – where their Spill Remediation training was held – for similar fields, raising concerns about their wages on ice.

129.    Understanding that Mr. VanMatre had previously claimed to have no control over increasing wages, Ms. Wise and her colleagues suggested non-monetary benefits in lieu of compensation, such as extra days off, expanded healthcare coverage, professional development, improved amenities/infrastructure in work centers, and more. Nothing ever came of these efforts.

130.    The following month, Ms. Wise learned that a male colleague of hers with significantly less experience and without supervisory responsibilities had been offered $800 per week to perform his job. This offer had come from Mr. VanMatre. Ms. Wise was only being

compensated at $803 per week to act as a Lead, *i.e.* a supervisor, and despite having significantly more experience than this male colleague, referred to herein as JA.

131.    That month, Ms. Wise raised concerns to Mr. VanMatre about this gendered pay inequity along with her substandard pay more generally.

132.    Mr. VanMatre offered to look into Ms. Wise's pay rate, yet he never followed up on this promise.

133.    Ms. Wise later learned that JA was actually earning $900 per week, nearly $100 more than her, as opposed to a nearly identical salary. Ms. Wise brought this gender-based pay inequity to the attention of Mr. VanMatre in December 2022, upon learning of it. Ms. Wise's pay rate was not adjusted.

134.    Importantly, this was only JA's second season on ice, he had no supervisory responsibilities, and he was only hired to work on a demolition project. Ms. Wise, meanwhile, was returning for her eighth season on ice, was required to supervise and train numerous employees both officially and unofficially (including JA), and she performed substantial work on the same demolition project as JA in addition to all of her other duties in the Waste Department.

135.    As part of her role as a Lead, Ms. Wise trained JA on the day-to-day operations in Waste, corrected his mistakes, and provided JA his truck orientation, driver's test, and forklift training.

136.    Upon her deployment to the ice in October 2022, Ms. Wise continued to raise concerns about her pay rate with Mr. VanMatre, Ms. Von Handorf, and her colleagues, including advocating on behalf of her subordinates for better pay.

137.    In November 2022, Mr. VanMatre verbally scolded Ms. Wise for "poisoning the

well" and being "negative" by engaging in and/or organizing discussions about pay. Mr. VanMatre then said that there should be no discussion of wages while at work.

138.    Ms. Wise, aware of her right to discuss wages in the workplace, continued to discuss wages in the workplace.

139.    In late November 2022, Ms. Wise wrote to the NSF through its Program Complaints email address asking how to best lodge a complaint regarding her disparate pay claims. She specifically noted, "I'm really not familiar with my rights other than it being unacceptable for my pay to be so much lower on the basis of my gender."

140.    On or around December 2, 2022, two investigators from the NSF held a call with Ms. Wise to discuss her gender-based pay disparity concerns.

141.    On or around December 4, 2022, Ms. Wise again met with Mr. VanMatre to discuss her concerns with pay disparity. At this time, Ms. Wise raised concerns not only with her compensation, but also with the disparate impact that low pay has on women and the link between lower pay and sexual harassment. She also specifically discussed her concern that she was being paid less than JA, a male colleague, despite holding a supervisory position.

142.    As noted above, just prior to the start of that season, USAP and the NSF published the SAHPR Report, a 274-page report that highlighted a significant pattern of sexual harassment and assault in the USAP program.

143.    Ms. Wise explained to Mr. VanMatre that, per the SAHPR Report, women who are underpaid for their work on ice are more likely to suffer from sexual harassment because they do not have the financial security to leave and thus are more vulnerable. Ms. Wise expressly referenced sexual harassment incidents she had witnessed on ice when discussing such with Mr.

VanMatre.

144.    During this meeting, Ms. Wise also raised concerns that her female colleagues were being unfairly compensated.

145.    Finally, Ms. Wise raised concerns that she was being retaliated against when Mr. VanMatre called her "negative" and chastised her for "poisoning the well."

146.    Mr. VanMatre did not substantively respond to these concerns.

147.    In late January 2023, Solid Waste Supervisor Paul Baker left the ice before the end of the season. Because Ms. Wise was the only person capable of performing the role, Defendant Six Mile promoted Ms. Wise into the position for the remainder of the austral summer season, which was ending the following month. Defendant Six Mile never considered JA for the position, let alone offered it to him.

148.    In January 2023, Mr. VanMatre once again raised concerns that wages were being discussed in the workplace.

149.    The following month, Mr. VanMatre directed communications about wages to include himself and Ms. Von Handorf – two managerial employees – while adding that he was "frustrated, actually, that this year's crew has had so many talks about pay without involving us."

150.    In addition to raising concerns about pay, Ms. Wise also raised numerous concerns about safety during the 2022-2023 austral summer season.

151.    These safety concerns included concerns about sexual harassment and assault on ice, as well as the lack of sufficient preventative measures to stop such behavior before it happens; insufficient mechanisms to prevent the spread of COVID-19; and hazardous working conditions (including but not limited to: freezing temperatures without heat, a lack of running water,

inadequate ventilation, lack of safety equipment and garb, malfunctioning equipment, under-trained staff, and inadequate staffing levels). This list of safety concerns is non-exhaustive.

152.    Mr. VanMatre considered raising these concerns to be a form of open criticism of "the client," meaning the NSF and the USAP, which he deemed unacceptable.

153.    According to Mr. VanMatre, workers are required to sign a document in which they agree not to "badmouth" the NSF prior to deploying each season. Mr. VanMatre considered this agreement even more important for those in leadership roles – such as Ms. Wise – to follow.

**H. Defendants Six Mile and Amentum Retaliated Against Ms. Wise by Blacklisting Her from the USAP Program for Having Engaged in Protected Conduct Under State and Federal Law**

154.    At the conclusion of the 2022-2023 season, Ms. Wise decided not to reapply for a position with Six Mile and instead to attempt to work for Defendant Amentum in the following season.

155.    Ms. Wise began applying for positions with Amentum on or around January 16, 2023, and she applied for 11 positions in total for the 2023-2024 austral summer season.

156.    Mr. VanMatre and Ms. Von Handorf ensured Ms. Wise would be unable to work for any USAP contractor, including Amentum, by falsely claiming that she was "ineligible for rehire" and/or by giving negative references to anyone who contacted them for such.

157.    On or around February 16, 2023, Amentum hiring manager Kristy Carney reached out to Mr. VanMatre to discuss Ms. Wise and other applicants.

158.    As part of this discussion, Ms. Carney inquired as to whether Ms. Wise was eligible for rehire.

159.    Ms. Carney made this inquiry as part of the agreement between the ASC

Contractors to blacklist any employee who is officially or unofficially considered ineligible for rehire by any other ASC Contractor.

160.    Mr. VanMatre spoke with Ms. Carney that day or soon thereafter and stated that Ms. Wise was not rehireable.

161.    For this reason, Amentum declined to consider Ms. Wise for any primary contracts.

162.    Furter, according to Ms. Carney, Mr. VanMatre made negative, defamatory statements about Ms. Wise. These statements were made in response to Ms. Wise's having engaged in protected conduct.

163.    In a June 2024 interview with an investigator for the Colorado Civil Rights Division ("CCRD"), Ms. Carney stated that Mr. VanMatre "talked about negative behavior of [Ms. Wise] on the crew" and "how it affected the morale of other people on the crew," with Mr. VanMatre claiming that Ms. Wise "was [a] bit disruptive."

164.    In his own June 2024 interview with an investigator for the CCRD, Mr. VanMatre admitted that Ms. Wise's concerns "were that [Six Mile's] employees were underpaid" and that "she raised that point of view with the team."

165.    Acknowledging that Ms. Wise raised employee safety concerns, Mr. VanMatre recalls responding to Ms. Wise that, "we work in Antarctica[.] OSHA is a guideline but we're not held to it," so the safety problems were not illegal.

166.    Mr. VanMatre also admitted that he asked that discussions surrounding pay include him, a managerial-level supervisor. He claimed that this directive was so that the conversations were productive, because "if the people who have the power to change [the pay rate] aren't involved, it's not productive."

167.    Despite this claimed reason for needing to be part of discussions around pay, any time Mr. VanMatre was involved, he declared that he was unable to change anyone's pay. He admitted as much to the same CCRD investigator, claiming that he and Ms. VonHandorf had told staff that they were "unhappy with the range [they had] to work with" but that "the salary range came from . . . the company [Six Mile] bought and [they] were stuck with their [pay] rates."

168.    Mr. VanMatre acknowledged that in both August and December 2022, Ms. Wise had expressed concerns about her pay rate as compared to that of JA.

169.    Mr. VanMatre also recounted that Ms. Wise had raised concerns that lower wages for women have more of an impact in terms of their power, which Ms. Wise discussed in relation to the SAHPR report.

170.    Finally, Mr. VanMatre admitted that he did, in fact, tell at least one recruiter that Ms. Wise was not rehireable.

171.    Ultimately, however, Mr. VanMatre denied refusing to hire Ms. Wise because of her having engaged in this protected conduct, instead stating that it was because of Ms. Wise's "consistent" criticisms of "the client," meaning the NSF and the USAP.

172.    Ms. Wise's only other consistent criticisms of the NSF and USAP were with respect to her significant safety concerns.

173.    Meanwhile, in her June 2024 interview with the CCRD, Ms. Von Handorf admitted that Ms. Wise "was often bringing up pay" and that Ms. Von Handorf's response to such was that Ms. Wise should "look for other employment" to better compensate her.

174.    Ms. Von Handorf also admitted that it was because of Ms. Wise's "dissatisfaction with the pay" that "it really seemed like she was unhappy [] working for [Six Mile]" and that "[i]in

a small community[,] that hurts the morale of the team and the team itself."

175.    In April 2023, Ms. Von Handorf took the position that she did not intend to rehire Ms. Wise because of this impact on "crew morale and the community," and she indicated her intention to share this opinion with Amentum recruiter Andrew Schultz.

176.    Less than one hour later, and in response to this email from Ms. Von Handorf, Mr. VanMatre expressly stated that Six Mile would never rehire Ms. Wise.  However, he noted that according to HR, Ms. Wise was "technically rehireable," as Six Mile had not documented any attempts to correct a behavioral concern.

177.    Of course, Six Mile had never attempted to correct Ms. Wise's supposed unacceptable behavior because that behavior – discussing wages and pay disparity in the workplace as well as safety concerns – is protected conduct under state and federal law.

178.    That same day, Mr. VanMatre wrote to Ms. Carney, "Hello, the [Six Mile] HR Dept has informed me that, legally, I cannot say that Anna 'Scout' Wise is not rehireable. As such, I would officially like to reverse my stand on this topic. Thank you, James."

179.    Thus, between at least February 16, 2023 and April 10, 2023, Six Mile had expressly told Amentum that Ms. Wise was ineligible for rehire.

180.    Based on this statement, Amentum declined to offer the position to Ms. Wise. Instead, Amentum offered the position working for Ms. Carney to JA, Ms. Wise's less-qualified and less-experienced male counterpart.

181.    Amentum also refused to pass Ms. Wise's application materials onto the hiring manager for a different position, specifically the Hazardous Cargo Specialist position, after Mr. Schultz contacted Ms. Von Handorf to determine Ms. Wise's eligibility for rehire.

182.    After Mr. Schultz communicated with Ms. Von Handorf, he told the pertinent Amentum hiring manager that she should move forward with other applicants.

183.    On or around April 21, 2023, Ms. Wise informed Mr. Schultz that she feared Amentum had received inaccurate information about her rehire status, and she provided additional references. Ms. Wise asked that Amentum reconsider her application for the Hazardous Cargo Specialist. Mr. Schultz never responded.

184.    Ms. Wise, determined to return to the ice, continued to apply for positions with Amentum.

185.    The only interview Ms. Wise was able to secure with Amentum for the 2023-2024 austral summer season was for the Construction Coordinator position.

186.    The only reason Ms. Wise was able to secure this interview was because the recruiter, Jovani Gamboa, had not communicated with Six Mile prior to scheduling the initial interview with Ms. Wise. She likewise did not communicate with Six Mile before passing along Ms. Wise's application to the hiring manager.

187.    Upon information and belief, these reference checks did not take place because a primary offer had already been accepted for the position, meaning that the department was only looking for alternates.

188.    Ultimately, Ms. Wise was able to secure an alternate contract for the Construction Coordinator position, which allowed her to go through the PQ process.

189.    Michelle Izzi, the former HR Manager for Amentum, explained to the CCRD that Ms. Wise "somehow" was issued this contract despite the fact that Ms. Wise had "not [been] recommended for rehire."

190. Upon learning of the provision of the alternate contract despite Ms. Wise's non-recommendation for rehire, Ms. Izzi spoke with Amentum's legal department.

191. Ultimately, the legal team decided not to rescind the contract.

192. Upon information and belief, this is because it was an alternate contract, which is an illusory offer of employment.

193. On April 30, 2023, Ms. Wise informed Amentum of her concern that Mr. VanMatre "targeted me last season in an act of retaliation," explaining that she filed a claim with the Department of Labor and also reported Mr. VanMatre to the Six Mile ethics office. This communication received no response.

194. On or around July 17, 2023, Ms. Wise learned that Amentum's Vehicle Maintenance Facility ("VMF") was hiring for light vehicle mechanics for the upcoming season. She emailed the hiring manager directly about the role, informing him that she already held an alternate contract with Amentum and that she was PQ'd.

195. Jonathon Abbott, the hiring manager, responded positively and swiftly, asking Ms. Wise for her resume and her experience in mechanics. Upon receiving Ms. Wise's response, Mr. Abbott asked Ms. Wise for her immediate availability for an interview.

196. Mr. Abbott indicated that while he wanted to preliminarily schedule the interview, he would still need "HR approval" before moving forward.

197. The following day, Mr. Abbott emailed Ms. Wise, "Unfortunately I am going to have to cancel that interview. I was not given approval to move forward. I was not given a reason why."

198. Later that day or the next day, Ms. Wise filed a complaint against Amentum through

EthicsPoint. Specifically, Ms. Wise noted that she believed she was being retaliated against by Six Mile for having complained of a male coworker – JA – earning a higher wage than her despite having less experience and fewer responsibilities. Ms. Wise also noted that she had spoken up about her safety concerns regarding sexual harassment and assault throughout the season.

199.    In her complaint, Ms. Wise explained her concern that Amentum was relying on references from Six Mile without giving proper regard to her actual job performance reviews or current references. She also complained that a less qualified man – JA – had been hired into a position for which she had applied and despite their having applied at the same time.

200.    Ultimately, Ms. Wise applied for eleven positions with Amentum for the 2023-2024 austral summer season and, despite her stellar qualifications and experience, was not offered a primary contract for any of them.

201.    Pursuant to the ASC Contractors' blacklisting agreement, Amentum refused to consider or hire Ms. Wise because Six Mile had informed it that she was ineligible for rehire or, in the alternative, had recommended against rehiring. Instead of hiring her, Amentum offered Ms. Wise an alternate contract without any intent of ever offering her a primary position.

## CLASS ACTION ALLEGATIONS

202.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rule of Civil Procedure.

203.    Plaintiff asserts claims on behalf of and seeks to represent a Class comprised of all workers who have accepted a job offer (either primary or alternate) and have been PQ'd during the applicable statutory period (the "ASC Employee Class").

204.    Additionally, Plaintiff asserts claims on behalf of and seeks to represent a Class of

all current and former employees of Defendant Six Mile during the applicable statutory period (the
"Six Mile Employee Class").

205.    Plaintiff reserves the right to amend and refine the class definitions above or add
classes and/or subclasses as litigation progresses.

206.    **Numerosity**: The Classes are so numerous that joinder of all class members is
impracticable. Upon information and belief, USAP deploys more than 2,000 people to Antarctica
annually, mostly during the austral summer. Included in these annual deployments are over 1,500
ASC Employees making up the ASC Employee Class. Of these, Six Mile employs approximately
25 deploying workers each year, which make up the Six Mile Employee Class. Thus, while the
exact number of each Class's members is currently unknown, Plaintiff believes the proposed ASC
Employee Class and Six Mile Employee Class each exceed forty members over the statutory
period for the claims at issue in this case. The members of each Class can be identified based on
Defendants' records.

207.    **Commonality**: Common questions of law and fact exist as to all members of all
Classes and predominate over any questions solely affecting individual members, including but
not limited to Defendants' agreements to unlawfully suppress Plaintiff's and the ASC Employee
Class's wages; whether Defendants' agreements and conspiracy violate federal and state anti-
competition law; whether Defendant Six Mile retaliated against Plaintiff and the Six Mile
Employee Class in violation of state law protecting the right to discuss safety matters in the
workplace; and the proper measure of damages.

208.    **Typicality**: Plaintiff's claims are typical of the members of the ASC Employee
Class because Plaintiff and the ASC Employee Class were all subject to Defendants' agreements

and conspiracy to unlawfully restrain competition and depress wages. Plaintiff and the ASC Employee Class were all subject to Defendants' retaliatory policies and practices.  Further, Plaintiff's claims are typical of the members of the Six Mile Employee Class because Plaintiff and the Six Mile Employee Class were all subject to Six Mile's policy or practice of restraining the right of workers to raise safety issues in the workplace. Plaintiff and the Six Mile Employee Class were all subject to Six Mile's retaliatory policies and practices.

209.    **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff is committed to the prosecution of this action and has retained counsel with extensive experience in class actions. There are no conflicts between Plaintiff or Plaintiff's counsel and the Classes Plaintiff seeks to represent.

210.    Class treatment is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Classes so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

211.    **Predominance and Superiority**: Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Joinder of all members of the Classes is impracticable, and class certification will promote efficiency by eliminating the complication and expense of duplicative litigation that might overwhelm the courts and result in inconsistent judgments concerning Defendants' practices. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**COUNT I**
**Violations of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(Plaintiff on behalf of herself and the ASC Employee Class Against All Defendants)**

212.   Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates by reference the allegations in all previous paragraphs of this Complaint.

213.   Defendants entered into and engaged in unlawful agreements in restraint of trade and commerce described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

214.   Defendants' agreements have included concerted action and undertakings among Defendants with the purpose and effect of (a) fixing the compensation of Plaintiffs and the ASC Employee Class at artificially low levels; and (b) eliminating, to a substantial degree, competition among Defendants for skilled labor.

215.   As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for skilled labor, members of the ASC Employee Class have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

216.   The unlawful agreements among Defendants has had the following effects, among others:

     a.   competition among Defendants for skilled labor has been suppressed, restrained, and eliminated; and

     b.   Plaintiffs and ASC Employee Class members have received lower compensation, benefits, and worse working conditions from Defendants than they otherwise would have received in the absence of Defendants' unlawful agreements, and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

217.   As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition for skilled labor, members of the ASC Employee Class

have suffered injury to their property and have been deprived of the benefits of free and fair competition on the merits.

218.    The acts done by each Defendant as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

219.    Defendants' contracts, combinations and/or conspiracies are per se violations of Section 1 of the Sherman Act.

220.    Accordingly, Plaintiff and members of the ASC Employee Class seek three times their damages caused by Defendants' violations of Section 1 of the Sherman Act, the costs of bringing suit, reasonable attorneys' fees, and a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of Section 1 of the Sherman Act.

## <u>COUNT II</u>
### Colorado Non-Compete Prohibition
### (Plaintiff on behalf of herself and the ASC Employee Class Against All Defendants)

221.    Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates by reference the allegations in all previous paragraphs of this Complaint.

222.    Defendants entered into, implemented, and enforced express agreements, specifically the no poach agreement, that are unlawful and void under C.R.S § 8-2-113 because they restrict the right of Plaintiff and the ASC Employee Class to receive compensation for the performance of labor by: (a) reducing open competition among Defendants for skilled labor; (b) reducing employee mobility; (c) eliminating opportunities for employees to pursue lawful employment of their choice; and (d) limiting employee professional advancement.

223.    Defendants entered into and enforced the agreements at issue in Colorado, where Defendants hired members of the ACS Employee class, and Defendants agreed that the employment of ACS employees would be governed by Colorado law.

224.    Defendants' agreements and conspiracy are contrary to Colorado's settled legislative policy in favor of open competition and employee mobility, and they are therefore void and unlawful.

225.    Defendants' agreements and conspiracy were not intended to protect and were not limited to protect any legitimate proprietary interest of Defendants.

226.    Defendants' agreements and conspiracy do not fall within any statutory exception to C.R.S § 8-2-113.

227.    Accordingly, Plaintiffs and members of the ASC Employee Class seek a judicial declaration that Defendants' agreements and conspiracy are void as a matter of law under C.R.S. § 8-2-113, a permanent injunction enjoining Defendants from ever again entering into similar agreements in violation of C.R.S. § 8-2-113, actual damages, statutory damages and/or penalties, costs, and attorneys' fees.

## COUNT III
### Colorado Public Health Emergency Whistleblower Act
**(Plaintiff on behalf of herself and the Six Mile Employee Class Against Six Mile)**

228.    Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates by reference the allegations in all previous paragraphs of this Complaint.

229.    At all material times, Six Mile was a "principal" within the meaning of C.R.S. § 8-14.4-101(3).

230.    At all material times, Plaintiff was a "worker" employed by Six Mile within the meaning of C.R.S. § 8-14.4-101(5).

231.    Under C.R.S § 8-14.4-102, it is unlawful for a principal to discriminate, take adverse action, retaliate or maintain a policy of threatening any of the above against any worker based on the worker, in good faith, raising any reasonable concern about workplace violations of government health or safety rules, or about an otherwise significant workplace threat to health or

safety, to the principal, the principal's agent, other workers, a government agency, or the public if the principal controls the workplace conditions giving rise to the threat or violation.

232.    Defendant Six Mile maintains and applied a policy of prohibiting workers from raising workplace concerns related to public health emergencies affecting the workplace and have retaliated against or threatened workers who speak out on issues workers reasonably believe are unlawful within the meaning of C.R.S § 8-14.4-102.

233.    These policies were imposed in Colorado where Six Mile hires its Antarctica-based employees, and Six Mile agreed that its employment of members of the Six Mile Employee Class would be governed by Colorado law.

234.    These policies and practices were intentional.

235.    As a result of Six Mile's discriminatory, adverse, or retaliatory employment practices, Plaintiff suffered economic and non-economic losses, including emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

236.    Defendants Six Mile's acts and conduct described herein were engaged in with malice or reckless indifference to the rights of Plaintiff and the Six Mile Employee Class.

237.    Accordingly, Plaintiffs and members of the Six Mile Employee Class seek a judicial declaration that Six Mile's policy and practice of retaliation for raising workplace health and safety issues violates C.R.S. § 8-14.4-102, a permanent injunction enjoining Six Mile from continuing to violate C.R.S. § 8-14.4-102, actual damages, statutory damages and/or penalties, costs, and attorneys' fees.

**COUNT IV**
**Colorado Anti-Discrimination Act – Retaliation**
**(Plaintiff Against Defendants Six Mile and Amentum)**

238.    Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates by reference the allegations in all previous paragraphs of this Complaint.

239.    At all pertinent times, Defendants Six Mile and Amentum were employers under the Colorado Anti-Discrimination Act ("CADA") because at all pertinent times they employed people within the State of Colorado.  C.R.S. § 24-34-401(3).

240.    Under CADA, it is a discriminatory or an unfair employment practice "[f]or any person, whether or not an employer . . . [t]o discriminate against any person because such person has opposed any practice made a discriminatory or an unfair employment practice by" CADA.  C.R.S. § 24-34-402(1)(e)(IV).

241.    Under CADA, it is a form of protected conduct to discuss wages in the workplace and to raise concerns or complaints of sex discrimination.

242.    As detailed above, Defendant Six Mile decided never to rehire Plaintiff as a direct result of her decision to discuss wages in the workplace and/or because she raised concerns or complaints of sex discrimination in the form of pay inequity based on gender.

243.    Further, Defendant Amentum agreed not to hire Plaintiff on account of Six Mile's labeling of Plaintiff as ineligible for rehire for having engaged in protected conduct under CADA.

244.    Defendants Six Mile's and Amentum's acts and conduct described herein were engaged in with malice or with reckless indifference to Plaintiff's protected rights.

245.    As a result of Defendants' unlawful conduct, Plaintiff has suffered injuries, damages, and losses, both economic and non-economic, in an amount to be determined at trial, and is also entitled to costs and attorneys' fees.

**COUNT V**
**Colorado Equal Pay for Equal Work Act – Retaliation**
**(Plaintiff Against Defendant Six Mile)**

246.    Plaintiff, on behalf of herself and all others similarly situated, realleges and incorporates by reference the allegations in all previous paragraphs of this Complaint.

247.    At all pertinent times, Defendant Six Mile was an employer under the Colorado Equal Pay for Equal Work Act ("CEPEWA") because it employs people within the State of Colorado.  C.R.S. § 8-5-101(5).

248.    At all pertinent times, Plaintiff was an employee under CEPEWA because she was employed by an employer.  C.R.S. § 8-5-101(4).

249.    Under CEPEWA, an employer "shall not discriminate between employees on the basis of sex . . . by paying an employee of one sex a wage rate less than the rate paid to an employee of a different sex for substantially similar work, regardless of job title . . . ."  C.R.S. § 8-5-102(1).

250.    Further, an employer shall not "[d]ischarge, or in any manner discriminate or retaliate against, an employee for invoking this section on behalf of anyone or assisting in the enforcement of this subsection (2)."  C.R.S. § 8-5-102(2)(c).

251.    And, an employer shall not "discharge, discipline, discriminate against, coerce, intimidate, threaten, or interfere with an employee or other person because the employee or person inquired about, disclosed, compared, or otherwise discussed the employee's wage rate."  C.R.S. § 8-5-102(2)(d).

252.    As detailed above, Defendant Six Mile retaliated against Plaintiff by intimidating, threatening, and interfering with her, including by deciding never to rehire Plaintiff because Plaintiff inquired about, disclosed, compared, or otherwise discussed her wage rate with coworkers and supervisors and/or because she invoked her right not to be paid a lower wage for performing substantially similar work to that of a man.

253.    Plaintiff's inquiry, disclosure, comparison, and discussions were motivating factors for Defendant's actions.

254.    As a result of Defendant's unlawful conduct, Plaintiff has suffered injuries, damages, and losses and is entitled to all forms of legal and equitable relief, including but not limited to employment, reinstatement, lost wages, pay increases, liquidated damages, and

compensatory damages, in an amount to be determined at trial, as well as reasonable costs, including attorneys' fees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment on her behalf and that of the Class by adjudging and decreeing that:

a. This action may be maintained as a class action, with Plaintiff as the designated Class representative and her counsel as Class counsel;

b. Defendants have engaged in a trust, contract, combination, or conspiracy in violation of Section 1 of the Sherman Act, and that Plaintiff and the members of the Class have been damaged and injured in their business and property as a result of this violation;

c. The alleged combinations and conspiracy be adjudged and decreed to be *per se* violations of the Sherman Act;

d. Plaintiff and the members of the Class she represents recover threefold the damages determined to have been sustained by them as a result of the conduct of Defendants, complained of herein, and that judgment be entered against Defendants for the amount so determined;

e. Defendants have violated C.R.S § 8-2-113 by restricting the right of Plaintiff and the Class to receive compensation for the performance of labor, that the Court declare that Defendants' agreements and are void as a matter of law and shall be permanently enjoined;

f. Plaintiff and the members of the Class she represents shall receive actual economic damages as established at trial, compensatory and consequential damages (including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowable by law in an amount to be determined at trial), punitive damages on all claims allowed by law and in an amount to be determined at

trial; liquidated damages as allowed by law, and statutory damages and/or penalties as allowed by law;

g.  All claims in this Complaint are in good faith and not frivolous and are filed for the purpose of extending, limiting, modifying, or reversing existing precedent, law, or regulation, including the laws and regulations that serve as the basis for the claims alleged herein, or for the purpose of establishing the meaning of the laws that serve as the basis for the claims alleged herein;

h.  Plaintiff and the members of the Class she represents recover attorneys' fees, costs of suit (including expert witness fees), prejudgment and post-judgment interest at the highest lawful rate, and such other and further relief at law and in equity as the Court may deem just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

DATE: January 6, 2025

**Spark Justice Law LLC**

*/s Laura B. Wolf*
Laura B. Wolf
3435 S. Inca Street, Suite C-113
Englewood, CO 80110
(303) 802-5390 (t)
(303) 848-3003 (f)
laura@spark-law.com

**ALR Civil Rights**
Aurora L. Randolph
9878 W. Belleview Ave., Suite 2129
Denver, CO 80123
(303) 968-1703 (t)
aurora@alrcivilrights.com

**Towards Justice**
Juno Turner
David H. Seligman
Rachel W. Dempsey
P.O. Box 371689, PMB 44465

Denver, CO 80237-5680
(720) 441-2236 (t)
juno@towardsjustice.org
david@towardsjustice.org
rachel@towardsjustice.org

**Nichols Kaster, PLLP**
Rachhana T. Srey
H. Clara Coleman
NICHOLS KASTER, PLLP
4700 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 215-6870
srey@nka.com
ccoleman@nka.com