## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-00031-JLK-TPO

ANNA WISE, on behalf of
herself and the Proposed Rule 23 Class,

     Plaintiff,

v.

AMENTUM SERVICES INC.;
GANA-A'YOO SERVICES CORPORATION;
SIX MILE LLC;
GRAY HAWK GLOBAL CORPORATION; and
LEIDOS, INC.,

     Defendants.

---

## RECOMMENDATION

---

**Timothy P. O'Hara, United States Magistrate Judge.**

This matter comes before the Court upon Defendants Leidos, Inc.'s ("Leidos"), Amentum Services Inc.'s ("Amentum"), Gana-A'Yoo Services Corporation's ("GSC"), Gray Hawk Global Corporation's ("GHG"), and Six Mile LLC's ("Six Mile") Motion to Dismiss Counts I and II of First Amended Complaint [ECF 69] and Defendants Six Mile's and Amentum's Motion to Dismiss Counts II-V [ECF 70]. Plaintiff filed responses [ECFs 77 & 78], and Defendants replied [ECFs 84 & 85]. At the Parties' request, on December 12, 2025, this Court heard oral argument on the Motions. ECFs 100 (Transcript of December 12, 2025 Status Conference); 103 (Minute Entry). The Court has considered the Parties' written and oral arguments, the case file, and the applicable legal authority in issuing this Recommendation. For the reasons stated herein, this Court recommends that the first Motion to Dismiss [ECF 69] be **denied, in part, and granted, in part**, and the second Motion to Dismiss [ECF 70] be **denied as moot**.

1

# BACKGROUND[1]

Plaintiff Anna Wise brings this First Amended Complaint ("FAC") on behalf of a purported Rule 23 class. ECF 67 at 1. This case involves allegations of antitrust conspiracy between employers in the United States Antarctic Program ("USAP"). Defendant Leidos is the prime contractor with the National Science Foundation ("NSF"), "the federal agency responsible for managing the USAP," for staffing support-related staff through the Antarctic Support Contract ("ASC"). *Id.* ¶¶ 4-6. Defendant Leidos employs some of its own support workers and also subcontracts with Defendants Amentum, GSC, Six Mile, and GHG ("ASC Contractors") to fulfill the ASC. *Id.* ¶ 6. Hiring for these positions is inherently unique, with some employees working on a per-season basis and others working year-round. *Id.* ¶¶ 7-8. However, all employees "redeploy" to the United States at the end of the season or between their annual deployment, during which times they work either remotely or in-person for the ASC headquarters located in Centennial, Colorado. *Id.* ¶ 8.

The FAC alleges that the ASC Contractors have entered into two agreements that violate the Sherman Act, 15 U.S.C. § 1: 1) not to poach employees who have already accepted an offer from or are working for one ASC Contractor, ECF 67 ¶¶ 50-72, and 2) to blacklist workers from being rehired with an ASC Contractor after having worked for another ASC Contractor, *id.* ¶¶ 73-79. In furtherance of the first agreement, the ASC Contractors agreed not to extend offers to workers who have received primary offers from another ASC Contractor and have also agreed to

---

[1] The Court takes the facts listed in this section from the well-pleaded facts found in Plaintiff's First Amended Complaint [ECF 67] and presumes they are true for the purposes of this Recommendation. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citing *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006)); *see also Boulter v. Noble Energy*, 521 F. Supp. 3d 1077, 1082 (D. Colo. 2021) (citing *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995)).

2

seek permission from one another before offering jobs to workers who have accepted alternate offers. *Id.* ¶¶ 10-12. The ASC Contractors utilize an internal database that maintains each worker's status, which the Defendants reference before determining whether to extend an offer to such worker. *Id.* ¶ 12. In addition to the agreements concerning prospective pre-season hires, Defendants allegedly maintain these practices throughout the season, meaning ASC employees already in Antarctica for the season are unable to freely seek employment from other ASC Contractors due to the no poach agreement. *Id.* ¶¶ 15-16.

As to the "blacklisting" agreement, the FAC alleges that an ASC Contractor may designate an individual as "ineligible for rehire" in the shared database, with the Defendants agreeing to blacklist any employee who receives that designation from future employment. *Id.* ¶¶ 12, 74-76. The ASC Contractors utilize this designation for a variety of reasons, including to punish those individuals that engage in protected conduct. *Id*. ¶¶ 74-75.

Because of these practices, the FAC alleges that workers are unable to leverage job offers for higher pay or for better working conditions. *Id.* ¶ 13.

Plaintiff also asserted claims on her own behalf against Defendants Six Mile and Amentum for retaliation. *See id.* ¶¶ 18, 155-180 (Counts III-V). However, Plaintiff's individual claims have been settled with both Defendants Amentum and Six Mile, rendering those Defendants' Motion to Dismiss [ECF 70] moot as to Counts III-V. *See* ECFs 93 & 101 (Notices of Settlement for individual claims). Accordingly, this Court will only consider Defendants Six Mile and Amentum's Motion to Dismiss [ECF 70] as to Count II, and only insofar as the Motion argues that Count II should be dismissed as an impermissible extraterritorial application of the Colorado Non-Compete Statute, C.R.S. § 8-2-113. *See* ECF 70 at 22-24.

## LEGAL STANDARDS

### I.        Fed. R. Civ. P. 12(b)(6)

In addressing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007). In doing so, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (internal quotation marks omitted). "While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in [her] complaint," *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012), "[t]he burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Mere 'labels and conclusions' and 'a formulaic recitation of the elements of a cause of action' will not suffice." *Khalik*, 671 F.3d at 1191 (quoting *Twombly*, 550 U.S. at 555). A court will "disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Id.* In the antitrust context, the Supreme Court has noted the expense of proceeding to antitrust discovery, so the Court must "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 544.  However, this does not impose a higher fact pleading standard on antitrust complaints. *Id.* at 570. In the context of a § 1 claim, "stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made;" this standard "simply calls

for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556.

## II.  Consideration of Information Outside the Complaint

Consideration of a Rule 12(b)(6) motion is generally limited to the four corners of the Complaint, with three limited exceptions. First, "attached exhibits and documents incorporated into the complaint by reference" may be considered. *Denver Health & Hosp. Auth. v. Beverage Distributors Co., LLC*, 843 F. Supp. 2d 1171, 1177 (D. Colo. 2012) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Second, the Court may take judicial notice of information, "such as certain documents contained in the public record." *Sweesy v. Sun Life Assur. Co. of Canada (USA)*, 643 F. App'x 785, 789 (10th Cir. 2016) (first citing *in re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1108 (10th Cir. 2015); and then citing *Binford v. United States*, 436 F.3d 1252, 1256 n.7 (10th Cir. 2006)). Third, the Court may consider "documents [that] are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)). But "Rule 12(b)(6) motions to dismiss are not designed to weigh evidence or consider the truth or falsity of an adequately pled complaint." *Tal v. Hogan*, 453 F.3d 1244, 1266 (10th Cir. 2006) (citation omitted). If consideration of information outside the complaint may require weighing evidence, making fact findings, or challenging the veracity of the allegations in the complaint, the court should generally decline to consider the exhibits or documents. *See Fuqua v. Santa Fe Cnty. Sheriff's Office*, 157 F.4th 1288, 1298-99 (10th Cir. 2025).

## ANALYSIS

### I.      Introduction

Defendants' principal attack on the FAC is based on Plaintiff's failure to plead "concerted action among competing employers." ECF 69 at 9. The Court notes that this type of a challenge is typically heard as part of a Rule 56 Motion as is reflected by many of the Defendants' case citations. *See id.* at 19 (citing *Holter v. Moore and Co.*, 702 F.2d 854 (10th Cir. 1983); *Siegel Transfer, Inc. v. Carrier Exp., Inc.*, 54 F.3d 1125, 1134 (3d Cir. 1995); *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999)). This is because "whether two [or more] entities have acted as one is generally a question of fact." *Allen v. Dairy Farmers of Amer., Inc.*, 748 F. Supp. 2d 323, 344 (D. Vt. 2010) (citing *Madison Square Garden L.P. v. Nat'l Hockey League*, No. 07 CV 8455 (LP), 2008 WL 4547518, *13 (S.D.N.Y. Oct. 10, 2008)).

In *Twombly*, the United States Supreme Court discussed the balancing act that courts must conduct at the motion to dismiss stage in a case involving allegations of antitrust activity. *See* 550 U.S. 544. On the one hand, the Court noted that all complaints, including those under the Sherman Act, "do[] not need detailed factual allegations" but must contain factual allegations sufficient "to raise a right to relief above the speculative level." *Id*. at 555 (citations omitted). On the other hand, the mere suggestion of parallel conduct "is thus much like a naked assertion of conspiracy in a Section 1 complaint," *id*. at 557, and considering the significant cost of discovery in antitrust cases, courts must be cautious. *Id*. at 558.

### II.     Section One of the Sherman Act

Section One of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "The essence of a claim of violation of Section 1 of the Sherman Act is the agreement

itself." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006) (citing *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 330 (1991)). Only unreasonable restraints on trade amount to § 1 violations. *See Ohio v. Am. Express*, 585 U.S. 529, 540 (2018) (citing *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). Thus, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombley*, 550 U.S. at 553 (citation modified). "[T]he facts showing such an agreement can be direct or circumstantial." *Llacua v. Western Range Assoc.*, 930 F.3d 1161, 1174 (10th Cir. 2019). "Direct evidence of a § 1 agreement may take the form of a written contract or agreement, such as association rules, or admissions of an agreement. . . In contrast, circumstantial facts require inferences that an anti-competitive agreement exists." *Id.* n.24 (citing *Champagne Metals*, 458 F.3d at 1083-84). Plaintiff alleges direct evidence of an anticompetitive agreement. *See* ECF 67 ¶¶ 10-12, 58-59, 75-79.

"[A]n antitrust plaintiff need not necessarily be a competitor or consumer." *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 963 (10th Cir. 1990) (citation omitted). Because federal antitrust laws are directed at "the protection of *competition*, not *competitors*," *see Brown Shoe Co. v. U.S.*, 370 U.S. 294, 320 (1962), the alleged harm must be to competition and not to a single plaintiff, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 136 (1998). In the employment context, competitors who engage in concerted action that "restraints competition in the labor market" may be found to violate § 1. *See Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 544 (10th Cir. 1995).

Once the existence of an agreement or conspiracy between two or more competitors has been established, the inquiry proceeds with "two main analytical approaches for determining whether a defendant's conduct unreasonably restrains trade: the per se rule and the rule of reason."

*Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1203 (10th Cir. 2006) (internal quotations omitted). Some restraints are unreasonable *per se* "because they always or almost always tend to restrict competition and decrease output." *Am. Express*, 585 U.S. at 540 (quoting *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)) (quotations omitted). Per se violations typically involve agreements between competitors, i.e., "horizontal restraints." *Id.* (quoting *Bus. Elecs.*, 485 U.S. at 723); *see also Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 186 (10th Cir. 2025) (quoting *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008)). If a restraint is not unreasonable per se, courts employ the fact-specific rule of reason assessment and evaluate the "market power and market structure . . . to assess the restraint's actual effect on competition." *Am. Express*, 585 U.S. at 529 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984)) (quotations and brackets omitted). Most restraints are evaluated under the rule of reason standard. *See NCAA v. Alston*, 594 U.S. 69, 88 (2021) (citing *Am. Express*, 585 U.S. at 529.

Applying a per se analysis "turns on whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead [is] one designed to increase economic efficiency and render markets more, rather than less, competitive." *Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.*, 472 U.S. 284, 289-90 (1985) (citations and quotations omitted). Courts are reluctant to apply the per se rule "where the economic impact of certain practices is not immediately obvious." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quotation omitted). Classifying conduct as a per se § 1 violation is based on the judicial system's "considerable experience with certain business relationships." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607-08 (1972). To gauge this experience, courts "focus on the particular <u>practice</u> involved, rather than the <u>industry</u> in which the allegedly unlawful

8

practice was used." *United States v. Kemp*, 907 F.3d 1264, 1273 (10th Cir. 2018) (citing *Arizona v. Maricopa Cty. Med. Soc'y.*, 457 U.S. 332, 351 (1982)).

Applying the rule-of-reason analysis is context-specific. Courts will "look[] to the circumstances, details, and logic of a restraint" before declaring it an unlawful restraint on trade. *NCAA*, 594 U.S. at 97 (quoting *California Dental Assn. v. FTC*, 526 U.S. 756, 770 (1999)) (internal quotations omitted). In some instances, a "quick look," requiring "only a cursory examination before imposing liability" may be sufficient when faced with plainly anticompetitive business activities. *Dagher*, 547 U.S. at 7 n.3 (citing *California Dental*, 526 U.S. at 770). "At the motion-to-dismiss stage, the plaintiff is only required to show that it is plausible discovery will reveal the defendants' agreement to be illegal." *Budicak, Inc. v. Lansing Trade Grp., LLC*, 452 F. Supp. 3d 1029, 1055 (D. Kan. 2020).

A complaint "is not obliged to plead under each possible rule," and a plaintiff may strategically choose to plead only a per se violation. *United States v. eBay*, 968 F. Supp. 2d 1030, 1037-38 (N.D. Cal. 2013). In such cases, courts are unwilling to review the allegations under the rule of reason when the plaintiff deliberately pleads only a per se violation. *See id.*; *see also Dagher*, 547 U.S. at 1280 n.2 (declining to address alternative rule of reason argument when only per se claim was pleaded). Plaintiff alleges only per se violations. ECF 67 ¶ 16.

### A. Competitors

Defendants' primary argument for dismissal is "that Defendants are not competitors with respect to staffing the USAP but rather are working together as parts of a 'single package' to achieve a common economic and commercial objective—Leidos's successful performance under the ASC." ECF 69 at 17. In Response, Plaintiff contends that when "separate economic actors

9

band together to achieve a common goal, that 'depriv[es] the marketplace of independent centers of decisionmaking.'" ECF 77 at 10.

All Parties agree that *American Needle* sets forth the applicable standard on this issue, so the Court starts its analysis there. In *American Needle*, the Supreme Court emphasized that the analysis should be guided not by "formalistic distinctions" but instead by a "functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate." 560 U.S. 183, 191 (2010). Looking at the teams in the National Football League ("NFL"), the Court noted that they "do not possess either the unitary decisionmaking quality or the single aggregation of economic power characteristic of independent action." *Id.* at 196. Although the Court acknowledged that NFL teams may have certain common interests, "they are still separate, profit-maximizing entities," such that their relevant interests were not necessarily aligned. *Id.* at 198 (citations omitted). Thus, *American Needle* counsels the Court to consider whether the challenged activity is perpetuated by a single decisionmaker within the economic context. If so, there can be no conspiracy under § 1. *See id.* at 195-96 (finding the NFL teams subject to § 1 because they compete in various regards, including in the relevant market for intellectual property).

### *Factual Allegations in the FAC*

Plaintiff notes in several places in the FAC that the Defendants are separate employers. ECF 67 ¶¶ 2, 19-23, 37-39. While this fact is not determinative, *American Needle*, 560 U.S. at 192-93, it provides the foundation for Plaintiff's theory of improper collusion. This fact also contradicts, at least in some respect, Defendants' argument that "Defendants do not act as competitors or independent centers of decisionmaking with respect to providing support personnel for the USAP." ECF 69 at 20.

Defendants also assert that "the Amended Complaint pleads no facts to suggest that Defendants are competitors under the ASC." ECF 69 at 21. In saying so, Defendants ignore one of the most basic tenets of the FAC: "[i]ndividuals interested in working in Antarctica regularly apply for positions with more than one ASC contractor, including for positions above or below their skill level or outside their normal area of employment, in an effort to secure any position." ECF 67 ¶ 36. Accepting that fact as true and viewing it in a light most favorable to the Plaintiff, the Defendants, who each have their own "internal recruiters," *id*. ¶ 37, necessarily are competitors as it relates to the individuals staffing their respective projects. That competition is extremely stiff considering how much time and energy is expended to train, credential, and transport the employees to the job site. *Id.* ¶¶ 46-49.

*Analysis of the Relationship between the Defendants*

To determine whether Defendants' conduct is covered by § 1, the relevant inquiry is whether the alleged activity furthers the Defendants' individual interests as "separate, profit-maximizing entities," *American Needle*, 560 U.S. at 198, or is in furtherance of one shared economic interest. Instead of meaningfully addressing this central holding of *American Needle*, Defendants argue that the FAC can only properly be read to allege cooperation amongst the Defendants that does not constitute an antitrust violation. *See e.g.*, ECF 69 at 9 ("[Defendants] work cooperatively like a single entity to staff positions in Antarctica to support Leidos's performance under the ASC."). Defendants also emphasize their role as subcontractors to the ASC and assert their "unity of interest" under this agreement. *See id.* at 19. The formalistic relationship under the ASC bears little on whether the Defendants can be competitors, and "[t]he justification for cooperation is not relevant to whether that cooperation is concerted or independent action." *American Needle*, 560 U.S. at 199.

11

To read the allegations in the FAC as suggested by Defendants, i.e., as demonstrating that the alleged arrangements between Defendants are in furtherance of Leidos's contract with the government, would require impermissibly drawing inferences in Defendants' favor, which the Court cannot do at this stage. Defendants are correct that Plaintiff alleges agreement and cooperation between Defendants in some sense, *but only for the improper purpose of not competing with one another. See e.g.*, ECF 67 ¶¶ 56-65 (agreement not to poach employees); ¶¶ 73-79 (agreement to blacklist workers).

Viewing the well-pleaded facts in the FAC in a light most favorable to Plaintiff, she alleges that Defendants have engaged in the alleged anticompetitive conspiracy to hinder the negotiating power of prospective and current employees to drive better working conditions and higher wages. The FAC further pleads the Defendants as separate entities that make independent hiring decisions. *See* ECF 67 ¶¶ 19-24, 34-40. Although Defendants note the functional nature of the inquiry as highlighted in *American Needle*, they cite no cases that support their broad assertion that operating as subcontractors necessarily renders the Defendants unable to compete. The FAC's allegations are enough to establish that Defendants are competitors as "separate economic actors pursuing separate economic interests" and each ASC Contractor is a potential "independent center of decisionmaking." *American Needle*, 560 U.S. at 197 (quoting *Copperweld*, 467 U.S. at 770) (quotations omitted).

Second, although the FAC pleads that the Defendants make independent hiring decisions and, functionally, operate as separate entities, it also alleges that Defendants utilize a shared database and have agreements not to poach prospective hires and employ a horizontal blacklisting policy. *See id.* ¶¶ 56-65. And based on the FAC, there would be "nothing to prevent each of the [defendants] from making its own market decisions" relating to hiring prospective workers.

*American Needle*, 560 U.S. at 200. As far as what Fed. R. Civ. P. 8(a) demands, this is sufficient factual matter to infer the existence of an illegal conspiracy. *See Twombly*, 550 U.S. at 570 (antitrust law does not demand a heightened pleading standard). Defendants also argue that Plaintiff's Sherman Act claims fail because Leidos could staff the ASC itself, and it would defy logic to conclude that Leidos must compete with itself. ECF 69 at 23. This is purely hypothetical and not the scenario before this Court. Leidos has chosen to subcontract with the ASC Contractors, and its choice to subcontract does not cut against whether the Defendants can engage in concerted action under the Sherman Act. *See American Needle*, 560 U.S. at 199 (rejecting notion that "necessity of cooperation transforms concerted action into independent action."). Whether the Class may ultimately succeed on these claims this Court cannot say, especially because the discovery process will be necessary to scrutinize Defendants' separate or unified economic interests.

The cases cited by Defendants do not support a different conclusion. Again, the Court notes that *Holter*, 702 F.2d 854; *Siegel Transfer, Inc.*, 54 F.3d 1125; and *Bogan*, 166 F.3d 509 were decided at summary judgment.[2] *Jack Russell Terrier Network of Northern Ca. v. Am. Kennel Club, Inc.*, found JRTCA, a national dog breed club, could not conspire with its regional affiliates, which the Ninth Circuit "best understood as extensions of the national club rather than independent economic actors." 407 F.3d 1027, 1035 (9th Cir. 2005). In *Allen v. Dairy Farmers of America, Inc.*, the court noted the principal-agent relationship alleged, and the failure to allege any facts demonstrating any independent action was fatal. 748 F. Supp. 2d 323, 344. These cases generally

---

[2] These three cases are also distinguishable because they all analyzed whether there was an agency relationship. Without elaboration, Defendants include one statement that they are acting as Leidos's agents. ECF 20 at 19. As noted in *Holter*, "[w]hether the relationship of the parties is employer-employee or principal-outside agent is normally a question of fact." 702 F.2d at 855 (citation omitted).

involved agency relationships or otherwise failed to plausibly allege independent decisionmaking, unlike the allegations in the FAC of independent hiring decisions and specific allegations of collusive conduct. Finally, the Court notes that Defendants also point to a presidential memorandum from President Reagan, which goes beyond the allegations in the FAC. *See* ECF 69 at 23-24. Plaintiff objects to consideration of the document as evidence of the federal government's intent to foreclose § 1 liability for ASC Contractors. *See* ECF 77 n.8. The Court declines to consider the 1982 Presidential Memorandum as evidence to support Defendants' reading of the FAC. *See Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006).

The FAC has sufficiently alleged that Defendants make independent decisions when hiring workers under the ASC. As a result, this Court finds that the FAC plausibly alleges that the Defendants are competitors whose conduct may be anticompetitive and subject to § 1 liability.

### B.  Antitrust Injury

Defendants next argue that the FAC fails to plausibly allege an antitrust injury, and Plaintiff lacks antitrust standing. *See* ECF 69 at 24-26. On this point, Defendants reiterate their contention that they work cooperatively and assert that the FAC's "alleged injuries therefore flow from the U.S. government's choice to contract under the ASC with a single prime contractor and the necessary cooperative relationship between Leidos and its subcontractors under the ASC and applicable regulations, not from any unlawful conduct." *Id*. at 25 (citing *Elliott Indus. Ld. P'ship v. BP Am. Prod. Co.*, 407 F. 3d 1091, 1124-25 (10th Cir. 2005)).

To establish antitrust standing, a plaintiff must allege "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 962 n.15 (10th Cir. 1990) (quotation omitted). Because the Sherman Act "protects market participants from

14

anticompetitive behavior in the marketplace," the alleged injury must stem "from a competition-*reducing* aspect or effect of the defendant[s'] behavior." *Elliot Indus.*, 407 F.3d at 1124 (10th Cir. 2005) (citations and quotations omitted). "In short, the injury to the plaintiff and the injury to competition must be one and the same." *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint. Inc.*, 863 F. Supp. 2d 1066, 1089 (D. Colo. 2012).

Defendants cite *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 265 (3rd Cir. 1998), to suggest that some regulatory framework of the ASP project mandates the alleged anticompetitive agreement. ECF 69 at 25. Such was the case in *West Penn Power Co.*, where "the regulatory scheme mandated, in part, that [the agencies] not compete." *Id*. However, unlike the "comprehensive regulatory scheme" discussed there, 147 F.3d at 259, the FAC alleges no such regulatory framework, nor do Defendants identify any comprehensive federal regulations requiring Defendants to utilize no poach agreements and blacklisting. The proper focus is on the alleged anticompetitive conduct, *see Champagne Metals*, 458 F.3d at 1082, and considering Plaintiff's allegations, the overarching government contract bears little relevance to this inquiry. Accepting the well-pleaded allegations as true, the FAC alleges that the class members' opportunities in the employment market have been harmed due to the Defendants' anticompetitive conduct, and not due to the government's contract with Leidos. ECF 67 ¶¶ 10-13. Specifically, due to the ASC Contractors' no poach agreement and mutual blacklisting, the workers are deprived of their ability to "leverage a job offer to seek higher pay or better working conditions." *Id*. Such injuries are sufficient to allege antitrust standing. *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 544 (10th Cir. 1995) ("[P]laintiffs whose opportunities in the employment market have been impaired by an anticompetitive agreement directed at them as a particular segment of employees have suffered an antitrust injury under the governing standard.") (citations omitted).

15

### C. Unreasonable Restraint

Defendants next argue, in the alternative, that the FAC should be dismissed because Plaintiff "fails to plead facts suggesting that the alleged no-poach or blacklisting arrangements are naked—and thus facially illegal—restraints." ECF 69 at 26. Defendants' arguments largely rely on the earlier assertion that they are "collaborators" and not "competitors" under the ASC. *See* ECF 69 at 26-29. Because the Court has considered and rejected this argument above, the Court need not address this in detail. The Court finds that the FAC has plausibly alleged a § 1 violation from the Defendants' non-compete agreements which facially restrict competition in the relevant employment market.

The FAC alleges that Defendants have agreed not to poach employees, which artificially reduces competition in a unique hiring market that should otherwise be highly competitive, *see* ECF 67 ¶¶ 34-72, and have utilized a shared database to blacklist employees "for a variety of reasons, including engaging in protected conduct under state and federal law," *id.* ¶ 74. As a result of the non-compete agreements, the FAC alleges that Defendants provide poor working conditions and are not incentivized to improve these conditions. *Id.* ¶¶ 80-85. These allegations plead horizontal agreement, between different economic actors, to manipulate the employment market. Facially, there is no logical economic efficiency or procompetitive purpose from blacklisting employees for any purpose, and especially when the blacklisting occurs because an employee is raising concerns about wage disparity or working conditions. *See, e.g., Brown v. JBS USA Food Company*, 773 F. Supp. 3d 1193, 1119-1123 (D. Colo. 2025) (finding a per se violation from defendants exchanging compensation data through a shared database to fix wages and agreeing to keep this information confidential); *In re Railway Industry Employee No-Poach Antitrust Litigation*, 395 F. Supp. 3d 464, 481 (W.D. Penn. 2019) (finding per se violation from horizontal

16

no poach agreement and noting antitrust law treats employment markets like other markets); *United States v. Patel*, No. 3:21-CR-220 (VAB), 2022 WL 17404509, at 9-11 (D. Conn. Dec. 2, 2022) (denying motion to dismiss criminal complaint and finding no poach agreement involving a company and its subcontractors was sufficiently alleged § 1 violation as a "horizontal agreement to allocate employees in a specific labor market").

Here, too, Defendants request that the Court construe the FAC in their favor by arguing "that the supposed arrangements relate only to Defendants' joint efforts to support Leidos's performance under the ASC." ECF 69 at 28. Defendants' reliance on *Dagher* on this point is misplaced. *See id*. (citing *Texaco, Inc. v. Dagher*, 547 U.S. 1, at 7-8). In *Dagher*, there was no competition between Texaco and Shell Oil because they participated in the market through a joint venture, evidenced by "*shar[ing] in the profits* of [the joint venture's] activities in their role as investors, not competitors." 547 U.S. at 6 (emphasis added). *Dagher* provides no support for Defendants' arguments because there are no allegations in the FAC that the Defendants have shared capital or profits.[3]

Defendants also cited several cases—all persuasive authority—in a string cite that do not merit a different conclusion. *See* ECF 69 at 28-29. First, three of these cases were decided after the benefit of discovery. *Medical Ctr. at Elizabeth Place, LLC v. Atrium Health System*, 922 F.3d 713 (6th Cir. 2019) (summary judgment); *Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999) (summary judgment); *Foreign Trade Corp. v. Otter Prods., LLC*, No. 14-cv-03133-RPM, 2017 WL 11686317, *1 (D. Colo. Feb. 15, 2017) (noting "unusual procedural posture" because "amended complaint was filed after months of discovery"). *Bogan* also is not on point because the

---

[3] Defendants also raise new arguments in their Reply, which the Court does not consider, including that the FAC "alleges a series of vertical arrangements between Leidos and each subcontractor Defendant, FAC ¶¶ 5-6." ECF 84 at 17.

17

alleged conspirators, independent contractor agents, were paid a uniform commission rate defined by the insurance company, and the Second Circuit found these agreements to be "between General Agents of the same company to restrain trade only in experienced sales agents of that company." *Bogan*, 166 F.3d at 511, 515. In *United States v. Patel*, which involved a no-poach agreement between a company and its subcontractors, the Court distinguished *Bogan* in denying a Fed. R. Crim. P. 12(b) motion to dismiss based on factors including the companies' independent hiring and employment practices. No. 3:21-CR-220 (VAB), 2022 WL 17404509, at 10-11 (D. Conn. Dec. 2, 2022). The court in *Patel* further found that the allegations demonstrated that the employees were "denied the higher wages or promotions that are often achieved by laterally moving through the labor market," unlike in *Bogan*, where the agents were paid a uniform commission rate. *Id.* at 11. This Court finds *Patel* more analogous than *Bogan* on the facts and because the alleged no-poach and blacklisting agreements here were not necessary to the Leidos contract and denied the employees "better wages, benefits, and/or working conditions." ECF 67 ¶¶ 65, 77.

Defendants further characterize the alleged anticompetitive agreements as "coordination [that] promotes efficient staffing under the ASC." *Id.* at 29. As noted by the Supreme Court in *Northwest Wholesale*, certain per se violations are so inherently anticompetitive that the conduct is "generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." 472 U.S. at 294. Defendants advance precisely this argument that any anticompetitive conduct is intended to promote efficient hiring under the ASC. *See* ECF 69 at 27-28.

Plaintiff responds that the no-poach and blacklisting agreements are "market-allocation agreements," which should be subject to a per se analysis. ECF 77 at 18 (citing *Ry. Indus. Emp No-Poach Antitrust Litig.*, 395 F. Supp. 3d at 481; *United States v. Brewbaker*, 87 F.4th 563, 575

(4th Cir. 2023); *eBay*, 968, F. Supp. 2d at 1039; *In re High-Tech Emp. Antitrust Litig.*, 856 F.

Supp. 2d 1103, 1120-22 (N.D. Cal 2012); *Markson v. CRST Int'l, Inc.*,  No. 5:17-CV-01261-SB-

SP, 2021 WL 1156863, at *4 (C.D. Cal. Feb. 10, 2021); *United States v. Kemp*, 907 F.3d 1264,

1277 (10th Cir. 2018)). Defendants do not address the market-allocation theory, focusing only on

whether the FAC alleges naked restraints. *See* ECF 69 at 26-30, n.10 (referring to allegations as

"group boycott"); ECF 84 at 15-18. Although no-poach agreements are not uniformly analyzed

under the per se rule, U.S. District Judge R. Brooke Jackson recently denied a Motion to Dismiss

a criminal indictment alleging a § 1 per se violation from a no-hire agreement. *United States v.*

*DaVita, Inc.*, No. 1:21-CR-00229-RBJ, 2022 WL 266759, at *8 (D. Colo. Jan. 28, 2022). Noting

the lack of consensus on the issue, District Judge Jackson reasoned that no-hire agreements can be

subject to per se analysis as naked horizontal market allocations—and not as a distinct category of

per se violations. *Id.* The Court finds this reasoning persuasive, and other courts have applied the

same analysis in denying motions to dismiss. *See, e.g, Markson v. CRST Int'l, Inc.*, No. 5:17-CV-

01261-SB-SP, 2021 WL 1156863, at *4 (C.D. Cal. Feb. 10, 2021) (finding adequate per se

violation from allegations that defendants agreed among themselves not to poach workers under

contract with another defendant); *in re Outpatient Med. Cntr. Employee Antitrust Litig.*, 630 F.

Supp. 3d 968, 989-90 (N.D. Ill. 2022); *eBay*, 968 F. Supp. 2d at 1038-39; *but see Giordano v. Saks*

*Inc.*, 654 F. Supp. 3d 174, 201 (E.D.N.Y. 2023) (no-hire agreement between luxury brands and

Saks not subject to per se analysis where the pleadings demonstrated restraint was related to

procompetitive collaboration, i.e., "continual risk" that luxury brands would poach employees

from department stores in which they sell products and concessions). Similarly, in *Patel*, the court

determined per se analysis was applicable to the no poach agreement involving a company and its

19

subcontractors because "the no poach agreement operates in the market in which companies horizontally compete: the labor market." 2022 WL 17404509, at *16.

In the end, dismissal on such grounds at this stage would require the Court to accept Defendants' explanations for this conduct, in essence viewing Plaintiff's allegations *in Defendants' favor*, contrary to the plain allegations in the FAC. Plaintiff has alleged that Defendants, although working side-by-side in Antarctica, have entered into agreements to eliminate competition in the employment market there, *see* ECF 67 ¶¶ 2, 13, 16, 57-85. Invitations to view facts in a light most favorable to the moving party must be rejected as contrary to the well-established law surrounding Rule 12(b)(6) claims. *See Berryman v. Niceta*, No. 23-cv-00285-CNS-NRN, 2023 WL 4847583, at *4 (D. Colo. July 28, 2023) ("At best, this argument invites the Court to draw inferences against the Complaint, which the Court cannot and will not do, and at worst simply ignores Plaintiffs' numerous and well-pleaded allegations."). Although the Court acknowledges the "presumption in favor of [the] rule of reason standard," *Bus. Elecs. Corp.*, 485 U.S. at 726, the Court reemphasizes that its inquiry at this stage is limited to the well-pleaded factual allegations. Again, "[i]t is sufficient at this stage for Plaintiffs to have plausibly alleged that discovery will reveal the illegality of the Defendants' agreement." *Budicak*, 452 F. Supp. 3d at 1055; *cf. Blanson v. Domino's Pizza Franchising, LLC*, No. 18-13207, 2019 WL 2247731, at **4-5 (E.D. Mich. May 24, 2019) (declining to announce a rule of analysis and denying a motion to dismiss claim for § 1 violation from no-hire agreement). As noted by the Ninth Circuit in *eBay*, whether the restraints are naked restraints sufficient to find a per se violation is yet to be developed at this stage of the litigation. 68 F. Supp. 2d at 1039. Because "the court cannot determine as a matter of law that per se treatment will be inappropriate," *id.*, Defendants' motion to dismiss should be denied as to this basis. *See Outpatient Med. Cntr.*, 630 F. Supp. 3d at 990 ("because Plaintiffs

have a plausible *per se* claim, the question becomes whether the evidence will establish that non-solicitation agreements do, in fact, nakedly allocate the market for . . . employees") (citations omitted).

### III.    Statute of Limitations

Defendants advance a cursory argument that the FAC should be dismissed because the allegations could have occurred outside of the four-year statute of limitations period. *See* ECF 69 at 31-32. At the 12(b)(6) stage, the statute of limitations, although ordinarily an affirmative defense, may support dismissal if the grounds for the defense are apparent from the face of the complaint. *See Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022) (citations omitted) (noting that a statute of limitations challenge may be made by way of a Rule 12(b)(6) motion "when the dates given in the complaint make clear that the right sued upon has been extinguished."). Defendants' Motion states that the FAC "fails to allege when the supposed no-poach or blacklisting arrangements began," ECF 69 at 31, implicitly acknowledging that the grounds for the defense are not apparent from the face of the FAC.

Defendants' argument is unconvincing. After all, Plaintiff alleges that because she raised various concerns about her work with Six Mile, in July of 2023, approximately 17 months prior to the filing of Plaintiff's lawsuit, Six Mile decided to label Plaintiff as "ineligible for rehire" and blacklist her. *See* ECF 67 ¶117, 119. Then, "[b]ased on Six's Mile's decision to blacklist Ms. Wise," Defendant Amentum followed suit and "effectuated Six Mile's blacklisting of Ms. Wise." *Id*. ¶¶ 119-20. And as noted by Plaintiff in her Response, Defendants' agreement constituted a continuing conspiracy, one in which the statute of limitations begins to run "with each act that injures the plaintiff." ECF 77 at 22 (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S.

21

321, 338 (1971); *Othart Dairy Farms, LLC v. Dairy Farmers of Am., Inc.*, 720 F. Supp. 3d 1087, 1099 (D.N.M. 2024)).

Because the Court cannot readily conclude that the right to relief has been extinguished based on the information alleged in the pleadings, *see Sierra Club v. Okla. Gas and Elec. Co.*, 861 F.3d 666, 671 (10th Cir. 2016) (citation omitted), Defendants' Motion to Dismiss must be denied on this basis.

### IV.    Colorado Non-Compete Statute, C.R.S. § 8-2-113

Under the Colorado Non-Compete Statute, "any covenant not to compete that restricts the right of any person to receive compensation for performance of labor for any employer is void." Colo. Rev. Stat. § 8-2-113(4)(a). Further, "[a]n employer shall not enter into, present to a worker or prospective worker as a term of employment, or attempt to enforce any covenant that is void under this section." *Id.* § 8-2-113(8)(a). Defendants first argue that Plaintiff cannot proceed under the Colorado Non-Compete statute because only counterparties may enforce the statute, ECF 69 at 32-33. Defendants also argue, as part of the other Motion to Dismiss, that the alleged conduct pertains to conduct in Antarctica, and the Colorado statute should not extend extraterritorially. ECF 70 at 22-23. This Court agrees with Defendants on the first argument and therefore need not reach the second.

Plaintiff brings this claim based on the allegedly illegal behavior between the Defendants in making no poach and blacklisting agreements. ECF 67 ¶ 149. At no point in the FAC does Plaintiff allege that Plaintiff and any Defendant entered into an agreement that would restrict Plaintiff's ability to contract with any of the other Defendants. *See generally id*. By its very nature, a covenant not to compete is a contract between an employee and employer. *See Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo. 2011) (viewing a covenant not to compete

22

as a contract between employer and employee thus requiring consideration); *see also* 1 James O. Castagnera, Patrick J. Cihon, & Andrew P. Morriss, *Termination of Employment*, § 8:39: Restrictive covenants and trade secrets (April 2026 Update). Defendants argue that Plaintiff fails to plead that "Plaintiff or any other ASC worker is or ever was a party to a covenant not to compete with any Defendant," thus failing to state a claim under C.R.S. § 8-2-113. This Court agrees with Defendants.

Plaintiff argues that the language of C.R.S. § 8-2-113 is so broad that it is meant to allow a private right of action for "*any worker or prospective worker*" who is "*harmed by employer's conduct*." ECF 77 at 27. However, at the outset of the relevant statute, the legislature explicitly stated that the new law was intended "to preserve existing state and federal case law in effect before August 10, 2022," C.R.S. § 8-2-113(1), which has always considered covenants not to compete as rising out of contract law between employers and employees. Additionally, Plaintiff's overly broad interpretation fails to account for the explicit language of the statute itself which supports Defendants' interpretation. *See* C.R.S. § 8-2-113(4)(a) (requiring notice to the employee); § 8-2-113(5) (describing a covenant not to compete as part of an "employment agreement or any other agreement"); § 8-2-113(7) (noting that workers are parties to covenants not to compete). Perhaps most telling is that Plaintiff fails to provide any case in support of her position that an agreement *between Defendants* could provide a basis to sue under the Colorado statute, instead choosing to rely on the "plain meaning of the statutory language." ECF 77 at 27.

Plaintiff relies heavily on the amended statute's mention of "any worker or prospective worker harmed by an employer's conduct" to support her claim. ECF 77 at 26 (citing C.R.S. § 8-2-113(8)(a)-(b)). However, this provision does not override the black letter law requiring covenants to not compete to be between employer and employee.

23

Because this Court finds that Plaintiff fails to state a valid claim under Colorado law based on C.R.S. § 8-2-113 and under existing state law precedent, this Court recommends dismissal of Count II without prejudice.

### V.    Individual Capacity Claims

Plaintiff and Defendant Amentum filed a Joint Stipulation of Dismissal of Plaintiff's Individual Claims against Defendant Amentum Services, Inc. with Prejudice, but the stipulation was not "signed by all parties who have appeared" to be self-effectuating under Fed. R. Civ. P. 41(a)(1)(A)(ii). ECF 96 at 2-3 (signed only by Plaintiff and Defendant Amentum). This Court construes the document under Fed. R. Civ. P. 41(a)(2) and **recommends** that the District Court dismiss Plaintiff's individual capacity claims against Defendant Amentum—Counts III and IV of the FAC—with prejudice.

### CONCLUSION[4]

For the reasons stated herein, the Court **RECOMMENDS** that:

1.  Defendants' Motion to Dismiss Counts [ECF 69] be **denied in part**, as to Count I,

2.  Defendants' Motion to Dismiss [ECF 69] be **granted in part**, as to Count II, and Count II be **dismissed without prejudice**;

---

[4] All parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).

3.  Defendants' Motion to Dismiss Counts II-V [ECF 70] be **denied as moot**; and

4.  The individual capacity claims against Defendant Amentum Services, Counts III and

    IV, be **dismissed with prejudice** per Plaintiff's request [ECF 96].


DATED at Denver, Colorado, this 31st day of March, 2026.

BY THE COURT:

_____
Timothy P. O'Hara
United States Magistrate Judge